Filed 6/25/15  Tuckwell v. State Personnel Board CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ELIZABETH TUCKWELL,<br><br>        Plaintiffand Appellant,<br><br>v.<br><br>STATE PERSONNEL BOARD,<br><br>        Defendant and Respondent,<br><br><br>DEPARTMENT OF SOCIAL SERVICES,<br><br>        Real Party in Interest and Appellant. | A140865<br><br>(Alameda County<br>Super. Ct. No. RG12660493) |

The California Department of Social Services (DSS) appeals from a judgment granting plaintiff Elizabeth Tuckwell's petition for writ of mandate directing the State Personnel Board (SPB) to set aside its order sustaining the decision of the DSS to place her on a 60-day suspension.  The trial court concluded plaintiff was denied due process at her SPB hearing when the administrative law judge (ALJ) elected to terminate the proceeding before she had finished presenting her case-in-chief.  The court also denied plaintiff's request for attorney fees, and she has filed a cross-appeal from that denial.[1]  We affirm.

---

[1] Plaintiff also purports to cross-appeal from the judgment *granting* her writ petition, asserting the trial judge erred in failing to rule in her favor on various alternative grounds.  Having cross-appealed, she then took advantage of the rule allowing a larger, combined respondent's and cross-appellant's opening brief, and she also filed a cross-appellant's

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff has been an attorney for the State of California for over 20 years, working for various agencies. She began working as staff counsel for the Community Care Licensing Division of the DSS in December 2003.

On February 28, 2011, the DSS served plaintiff with a 26-page Notice of Adverse Action (NOAA), imposing a 60-day suspension for conduct alleged to be in violation of Government Code section 19572.[2] The NOAA sets forth 13 charges involving seven different administrative proceedings in which she represented the DSS. Many of the charges are based on her handling of a case called *Chanticleer* (the name of the respondent residential care facility). The charges center largely on her alleged failure to comply with a prehearing order requiring her to have prepared five sets of exhibit binders, as well as on her unprofessional conduct during the hearing. The remaining charges were based on six other cases involving individual respondents—*Vinarao, Butler, Rosa, Cueneca,*[3] *Anderson,* and *Carpenter*.

The specific acts of misconduct pertaining to *Chanticleer* allege that plaintiff: (1) failed to comply with the order to prepare the exhibit binders, (2) arrived late to the administrative hearing, (3) failed to timely secure and prepare witnesses, (4) was unprepared at the hearing, and (5) asked secretarial staff to do paralegal work.

---

reply brief, thus getting the last word. Her briefing on cross-appeal should have been limited to the issue of attorney fees only, since only a "party aggrieved" can prosecute an appeal (Code Civ. Proc., § 902). A party is legally "aggrieved" for appeal purposes only if its "rights or interests are injuriously affected by the judgment." (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737.) If a respondent to an appeal desires to raise additional reasons as to why the result below was correct, she can use her responding brief to point out that in addition to all the reasons given by the trial court, its judgment was correct for other reasons as well. We exercise our discretion to accept the filing of plaintiff's oversized briefs; however, we admonish her counsel to refrain from filing such briefs in the future.

[2] Government Code section 19572 sets forth the grounds for imposing discipline on state employees.

[3] Erroneously referred to as *Constantino* in the NOAA.

With respect to *Vinarao,* plaintiff allegedly showed a lack of competence in getting documents admitted into evidence during an administrative hearing. *Butler* concerned a certified foster parent who had appealed the denial of his request for a criminal record exemption. Without consulting with the DSS's client agency, plaintiff told the ALJ the request was unopposed. In *Rosa,* another case involving criminal records, she refused to provide her supervisor with a recommendation on how to proceed. In *Cueneca,* plaintiff filed a request to disqualify an ALJ without asking for authorization. She thereafter failed to provide her supervisor with a list of all the cases in which she had filed such requests. In *Anderson,* she contacted the respondent's spouse on his behalf, in violation of a domestic violence restraining order.[4] Finally, in *Carpenter,* plaintiff allegedly advocated for the respondent in seeking relief from a training requirement.

On April 8, 2011, plaintiff filed a notice of appeal of the 60-day suspension with the SPB. The SPB hearing was conducted over eight calendar days before ALJ Barbara Allen-Brecher, commencing at 3:30 p.m. on Monday, March 12, 2012. Because resolution of this appeal turns on whether the hearing resulted in a denial of due process, we summarize the proceedings in some detail.

### March 12, 2012—Day One

The DSS put on its case-in-chief first. Following preliminary motions, Greta Wallace, Chief Counsel for the DSS, testified until 5:02 p.m. that afternoon.

In October 2010, Wallace learned plaintiff had entered peremptory challenges against ALJs at the Office of Administrative Hearings (OAH) without first obtaining approval from her supervisor, in contravention of DSS policy. Thereafter, plaintiff failed to comply with her supervisor's request to document the instances in which she had issued the challenges.

---

[4] The NOAA indicates she was given a corrective memo regarding this incident on March 11, 2008. Shortly after filing her appeal to the SPB, plaintiff filed a motion to strike the *Anderson* allegation, arguing the cause for discipline occurred outside the three-year period allowed by Government Code section 19635.

3

*March 13, 2012—Day Two*

On March 13, 2012, the hearing commenced at 11:10 a.m., following an unsuccessful settlement discussion. ALJ Allen-Brecher granted a motion under Evidence Code section 703.5 to quash plaintiff's subpoenas of two OAH ALJs, David Benjamin and Diane Schneider.[5] As Wallace's testimony resumed, plaintiff was admonished for talking to her attorney. This would not be the last such admonishment.

Wallace became concerned when plaintiff failed to reveal the ALJs she had challenged. Plaintiff had sent an e-mail stating she would be unable to supply this information. This was a concern because plaintiff had been with the DSS for years and Wallace had no idea how many peremptory challenges she could have issued. Plaintiff never did comply with the request to provide a list of her challenges.

After a break, the hearing resumed at 1:03 p.m. ALJ Allen-Brecher asked plaintiff's counsel to tie her cross-examination to the charges in the NOAA.[6] Wallace conceded the DSS does not have a centralized reporting system that would list all the cases in which plaintiff appeared. She explained plaintiff's supervisor, Darryl East, had assigned plaintiff to Criminal Background Check Bureau (CBCB) cases after the *Chanticleer* case, as part of a disciplinary action. CBCB cases are not included in DSS case status reports.[7] Wallace did not think plaintiff would need a list of cases to prompt her memory because peremptory challenges are so infrequently filed. She admitted the DSS does not have a written policy regarding the procedures for filing such challenges.

As plaintiff's counsel began questioning Wallace about an e-mail relating to another attorney's open case status report, ALJ Allen-Brecher said she was unable to see the relevance of the line of questioning. She also stated: "Counsel, I'm just going to put

---

[5] ALJ Benjamin presided over *Chanticleer*. It appears ALJ Schneider was involved in the *Butler* case. Another subpoenaed ALJ, Perry Johnson, did not join the motion to quash.

[6] After a few more minutes of questioning, the judge asked counsel to identify the offer of proof. The judge indicated her questions were confusing.

[7] At this point, plaintiff was reminded not to speak to her counsel during the hearing.

you on notice now, both parties, that—because I'm very concerned about us even being able to finish this case by Friday, we're only going to have examination limited to direct, cross and redirect, period. And that means in both Respondent's case in chief and the Appellant's case in chief, so it will be evenhanded."

The questioning shifted to the *Chanticleer* matter. That case was a license revocation proceeding involving a senior residential care facility. Plaintiff's counsel questioned Wallace about Kathi Gilmour-Benner, another DSS attorney who worked on *Chanticleer*. ALJ Allen-Brecher again directed her to focus on the charges in the NOAA, rather than "dancing around the charges." On redirect, Wallace said plaintiff could have been provided with a list of all the CBCB cases she had worked on. Wallace also revealed that Gilmour-Benner was assigned to assist in *Chanticleer* because plaintiff was not handling the case well. This was a very large, high-profile case, and it was critical for the DSS to prevail.

Wallace spoke with the OAH Presiding ALJ Cheryl Tompkins before approving the NOAA. At this point, plaintiff's counsel made a hearsay objection, noting the DSS had filed a motion to quash the original declarant's subpoena. Wallace testified ALJ Tompkins told her ALJ Benjamin had told ALJ Tompkins that plaintiff was unprepared in *Chanticleer*. Plaintiff was also "oppositional and argumentative," and had arrived late on two occasions. ALJ Allen-Brecher admitted the hearsay, finding it went to the issue of the harm to the DSS's reputation. She again reprimanded plaintiff for talking to her counsel.

Wallace expanded on the hearsay, saying ALJ Tompkins had also relayed that the DSS's witnesses were not properly lined up. There was also a "huge problem" with the exhibits. Plaintiff had been instructed to prepare five sets of exhibit binders, but failed to do so. Finally, ALJ Benjamin became so "exasperated" that he offered to prepare his own set. The opposition also offered to assemble their two sets. In addition, plaintiff's argumentativeness was seen as "troubling" and "disrespectful."

Trish DeBaun testified next for the DSS. She is a senior legal analyst. Her primary job is to assist her assigned attorneys in preparing administrative cases. Each

DSS attorney is assigned a legal analyst and a secretary. They work together as a team to ready cases for hearing.

In January 2010, plaintiff called DeBaun and told her all of the *Chanticleer* exhibits needed to be put in three-ring binders by the following Tuesday morning. DeBaun told plaintiff she could not authorize the request.[8] East then spoke to plaintiff and he became upset. Later, several people had to help her with the project, which disrupted DeBaun's regular work. It was a very large task, with the exhibits covering four conference tables.

DeBaun stated that senior legal typists do not contact witnesses. Mary Ann David is a typist. She told DeBaun plaintiff had asked her to contact two witnesses, which made David very uncomfortable. DeBaun advised David to tell her superior. DeBaun had never heard of an attorney asking a typist to contact witnesses.[9]

### *March 14, 2012—Day Three*

On March 14, 2012, the hearing started at 9:10 a.m. with East's testimony. East is an assistant chief counsel with the DSS and had been plaintiff's supervisor for the previous four years. Plaintiff's job was to work up her assigned cases by obtaining documents and preparing witnesses for hearings. She was currently assigned to do criminal background check cases. He assigned her to CBCB cases after *Chanticleer* because he felt she needed to improve her trial skills. Leslie Evans is the lead attorney for these cases. Attorneys on CBCB cases have at least two weeks to review the case file prior to the hearing. CBCB hearings are not complex and rarely require testimony.

In late September 2010, East learned plaintiff had exercised a peremptory challenge against ALJ Benjamin in the *Cuenca* case. The DSS has a "long-standing policy" that an assistant chief counsel needs to authorize such challenges before they are made. Challenges create scheduling problems for the presiding ALJ. They can also create ill-will towards the DSS amongst other ALJs. East did not think ALJ Benjamin

---

[8] DeBaun was not the legal analyst assigned to work with plaintiff in the *Chanticleer* case.

[9] The hearing went off the record at 4:50 p.m.

6

was biased against the DSS in the *Chanticleer* case. When East learned plaintiff had filed the challenge he was "stunned." He approached ALJ Tompkins, who told him she thought plaintiff had challenged Benjamin three or four times. He asked plaintiff several times to give him a list of the cases in which she had made these peremptory challenges. She never complied with this request.

The DSS has an internal tracking system for CBCB cases. There is also another database that tracks case documents electronically. East estimated plaintiff would have had to review approximately 28 CBCB cases to comply with his request. Instead of complying, she responded by questioning the policy. As her boss, he expected her to follow his order.

In *Vinarao,* the respondent had signed a document admitting she had sustained three criminal convictions. The convictions involved seven documents, which should have taken 10 to 15 minutes to admit into evidence. East went to the hearing to observe plaintiff. It took her about an hour and 15 minutes to get the exhibits admitted. She also appeared to be unfamiliar with the file. East was concerned because the task should not have been very difficult.

The *Carpenter* case was an "exclusion" case assigned to plaintiff. The respondent had failed to complete anger management training within a specified period of time. Her counsel contacted plaintiff to request an extension. Plaintiff then contacted the licensing agency's regional manager. East believed this was inappropriate. Normally, such requests are not handled by the legal division. The regional manager called East to express concern because it appeared plaintiff was advocating on behalf of the respondent and not the agency.

The *Butler* case involved a foster parent who had sustained a conviction for pointing a rifle at his brother. The respondent was seeking an exemption so he could continue to be a foster parent. An accusation was prepared and filed at the request of the client agency. The case was assigned to plaintiff. After the hearing, East reviewed the ALJ's proposed decision. East was considering alternating (rejecting) the ruling. However, when he read the decision it reflected plaintiff had not opposed the foster

7

parent's request. Even though the client wanted to reject the decision, East decided they could not because plaintiff had already conceded the issue. When he questioned her, she indicated she did not know she had to consult with the client in these kinds of cases. This was a theme with plaintiff. She did not represent the client's position but instead did what she thought was right. In this case, the client was upset with the result.

In *Rosa,* East asked plaintiff to make a recommendation and she responded, "I don't care." When he asked her again, she said, "I'll do whatever you say." He was concerned about her preparedness, professionalism, and her judgment.

In the *Anderson* case, the respondent had been arrested for spousal abuse and was seeking an exemption. The case went to a hearing. The abuse victim called East, complaining plaintiff had contacted her on behalf of the respondent to ask her about some overdue electric bills. Plaintiff then started commiserating with her about her relationship, which was upsetting. East was very concerned because plaintiff assisted in violating a domestic violence restraining order. Plaintiff admitted she made a mistake and said she had been tired.

East assigned *Chanticleer* to plaintiff in March 2009. He admitted it was a mistake to give her such a big case, but at the time it seemed likely to settle. Plaintiff had done revocation cases like this before. The hearing was continued several times, and commenced on January 4, 2010. In late 2009 she did not request help to prepare the trial documents. If he had known she needed more help, he would have assigned someone to her.

One day in the first week of January 2010, DeBaun told him plaintiff wanted approval to ship files overnight from San Jose to the Oakland DSS office. He questioned this because he knew DeBaun had not been assigned to work with plaintiff. He spoke by telephone with plaintiff that day (a Wednesday) and she said she needed three copies of 3,000 pages of exhibits by the following Monday or the judge could impose sanctions. East was concerned because that Friday was a furlough day. Plaintiff suggested he call the judge himself. East responded that she was the attorney representing the DSS, not

him.  At the time, East did not know ALJ Benjamin had issued an order in November 2009 requiring the exhibits to be placed in binders.[10]

East coordinated with a private carrier to get the documents from San Jose to the Oakland office.  That Thursday, a group of about four workers copied the documents and put them in binders.  Plaintiff picked up the binders that afternoon.  The task disrupted the office.  When he learned of ALJ Benjamin's November order, he asked her why she had not complied.  She said she did not think the office had enough binders.  He was troubled by her lack of organizational skills and believed the delay cast the legal division in a bad light.

At this point in the hearing, up to two hours was spent listening to hearing recordings to verify the accuracy of *Chanticleer* transcript excerpts quoted in the NOAA.  Afterwards, ALJ Allen-Brecher told the DSS attorney he had 45 minutes to complete his examination of East.  Plaintiff's counsel estimated she would need at least two hours for cross-examination.  The judge gave her three hours.  The judge stated that "it would not be economical" to call plaintiff in the DSS's case-in-chief.  Instead the DSS's counsel would be allowed a "full opportunity to cross-examine."  She also asked the parties to speed up the case because she had limited availability the following week.  Plaintiff's counsel complained this would give her less than one day for her client to testify, whereas the DSS would have used four days.  The judge assured her she would have all the time she would need.  The hearing concluded at 5:24 p.m.

***March 15, 2012—Day Four***

On March 15, 2012, the hearing commenced at 9:49 a.m.  After considering some evidentiary matters, ALJ Allen-Brecher moved to whether the statute of limitations applied to the *Anderson* charges.  Once more, she admonished plaintiff to stop talking to her counsel while on the record.  When plaintiff did it again, she ordered her to sit in the

---

[10] The record shows the order issued on November 24, 2009, following a prehearing conference.

9

back of the hearing room. After deeming the *Anderson* charges time-barred, testimony relating to that case was stricken from the record. East resumed testifying at 11:04 a.m.

The regional manager for the client agency in *Chanticleer* called East midway through the hearing to report that two of its employees were concerned about how the proceeding was going. ALJ Benjamin had admonished plaintiff, and one of the employees had been there for over four days and had not yet testified. East decided to send Gilmour-Benner to assist plaintiff. East also heard about witnesses who had been subpoenaed late and who had not received lodging. Legal analyst Susanna Lacayo[11] told him witnesses were angry about the late subpoenas. Also, some documents were not sent to the expert witness until December 28, 2009, even though the hearing was set for January 4, 2010. East assumed the expert would have needed more time. He was concerned because the hearing date was known before the end of November but it was over a month before this witness was able to review the evidence. He admitted he should not have given plaintiff the case because it had political potential and it did not match her skill level.

East denied ever telling plaintiff to tell ALJ Benjamin that the DSS could not comply with the judge's binder order. Instead, he told her to advise the judge "that we may not be able to do that." In reviewing a summary of the hearing, he felt plaintiff's performance was significantly below what would be expected of a staff counsel. On cross-examination, he conceded plaintiff had asked Lacayo to put the exhibits in binders on November 23, 2009.

East also denied he asked plaintiff to provide a list of peremptory challenges in order to commence this disciplinary proceeding. He claimed he wanted to learn plaintiff's reasons for filing the challenges to determine if they were justified. As to the *Vinarao* case, he admitted he never received any complaint regarding plaintiff's presentation. In the *Carpenter* matter, a program manager did ultimately approve the extension request. However, East believed plaintiff had lobbied on the respondent's

---

[11] Lacayo was assigned to work with plaintiff on *Chanticleer* in August 2009.

behalf when she should have deferred to the client. After about an hour and a half of cross-examination, ALJ Perry Johnson testified out of order for plaintiff.

Johnson is an ALJ with the OAH. He decided not to join in the motion to quash because he wanted to participate. Plaintiff has appeared before him many times. In the *Vinarao* case, the evidence involved about eight different Florida criminal convictions. He was given a large packet of bound materials. He reorganized the pages to better reflect the respondent's various convictions and court appearances. Plaintiff did not have trouble laying the foundation for the documents. The records were complex and he wanted to arrange them in a more efficient manner to correspond to how he drafts his decisions. At the end of the hearing, East approached him and whispered he was happy Johnson had been so patient with plaintiff. This surprised Johnson because he thinks he is patient with all counsel. He did not think plaintiff had embarrassed the DSS. After a short recess, the hearing resumed at 4:08 p.m. with East's cross-examination.

East had never given plaintiff a performance review. He conceded plaintiff issued some subpoenas for *Chanticleer* in early December 2009. He also acknowledged he approved Lacayo's vacation for December 28, 2009, through January 2, 2010. The hearing concluded at 5:00 p.m.

### March 16, 2012—Day Five

On March 16, 2012, the proceedings started at 9:15 a.m., continuing East's cross-examination. When he approved Lacayo's time off, he did not assign another legal analyst to help plaintiff. There was no request for such assistance. He did not know why Lacayo could not get binders in November 2009, but he would have expected plaintiff to bring any problems to his attention. While she had no supervisory powers over legal analysts, she could have approached him. At this point, ALJ Allen-Brecher enforced the time limit for cross-examination and limited DSS's redirect. At 10:40 a.m. DeBaun returned as a witness.

DeBaun knew Lacayo had been working on a big case because she saw boxes of documents in her cubicle. Lacayo told her she was very busy preparing exhibits. If DeBaun had needed binders, she would have looked in the storage room and if they were

11

not there she would have asked her supervisor to help her obtain them. It takes about 15 minutes for DeBaun to prepare a subpoena if she has the name and the address. If an address is not in the file, she will ask the attorney how to find it.

At 11:22 a.m., Lacayo was called as a witness on behalf of the DSS. The recording of her testimony cut off at 12:02 p.m. Just before the recording ended, she testified she told plaintiff on November 23 that there were not enough binders in the office and asked her what she should do. Plaintiff told her to do whatever she thought would work.

### April 17, 2012—Day Six

The following month, the SPB hearing resumed on Tuesday, April 17, 2012, at 10:43 a.m. ALJ Allen-Brecher had added three more hearing days to the proceeding. Lacayo's direct examination resumed. There is no indication the parties were aware the recording had failed during the previous hearing day. The judge allowed about 15 minutes of direct testimony. After cross-examination and final redirect, the hearing would move to plaintiff's case-in-chief. The judge did not set a firm deadline for completion of plaintiff's portion of the case. As they broke for lunch, the ALJ gave plaintiff two hours for cross-examination: "My concern is that we scheduled the dates for the hearing based upon the representation that you folks gave me as to the amount of time it was going to take. So I don't want this to string out past the three days that we've scheduled." The hearing resumed at 1:35 p.m. A witness named Helga Wong was called out of order for plaintiff.

Wong is a licensing program analyst. She was involved in the *Chanticleer* matter. The facility committed ongoing violations, even after the case was sent to the DSS's legal department. The hearing itself took 16 days, which she believed is long.[12] Plaintiff presented documents and witnesses at the *Chanticleer* hearing. Plaintiff knew the names of the witnesses and she appeared to be prepared. She coached Wong through the

_____

[12] During Wong's examination, ALJ Allen-Brecher asked plaintiff's counsel if she had the transcript from the *Chanticleer* hearing. Counsel indicated she did not and that her computer was not able to play the DSS's recordings of that hearing.

12

process of testifying. If a question was confusing, plaintiff was able to clarify. Another DSS attorney appeared at the hearing about halfway through. She did not take over the case, and plaintiff was the lead attorney at all times. The facility ultimately had its license revoked, which was an acceptable result.

Initially, Wong was concerned about plaintiff's professionalism because she came late on the first day and the ALJ took notice. There were issues with the exhibits not being in binders, which also caused conversations with the judge. After the exhibits were placed in binders, the hearing moved along. The judge's demeanor was professional at all times. When the second DSS attorney joined, things seemed to move forward faster.

Cross-examination of Wong began around 2:35 p.m. Wong testified her manager complained about the binders not being prepared. Witnesses had difficulty locating the exhibits when they were loose in boxes. Wong offered to help plaintiff put them in the binders. Plaintiff came late to the hearing more than once. Sometimes the ALJ had to coach plaintiff on the questions she was asking. There were issues regarding how much time it took plaintiff to formulate her questions. She was not fast on her feet, but she did have questions written out for her witnesses. Wong was excused at 3:02 p.m.

Lacayo's cross-examination resumed at 3:28 p.m. During one exchange, the ALJ indicated the parties had until Thursday at 5:00 p.m. to conclude the case. Lacayo testified she worked on the *Chanticleer* case prior to November 29, 2009. She was assigned to plaintiff in August 2009. When plaintiff asked her to put the exhibits in binders, Lacayo told her there were not enough binders and the person who ordered binders was on vacation. This conversation occurred around November 23, 2009.

After a discussion regarding a discovery issue concerning Lacayo's daily planner, ALJ Allen-Brecher stated, "I'm trying to keep us on track. I would like us to get done by the end of the day Thursday. It only hurts your client if we don't get done because then we don't get a decision any sooner. And based upon the representations that everybody gave to me as to who the witnesses were going to be, we shouldn't have any problem getting done. But if we start getting into evidence that isn't in the prehearing conference statement, that I haven't ordered be presented, it's going to take extra time."

13

Cross-examination continued until 3:59 p.m. Plaintiff's counsel stated her plan had been for plaintiff to testify at the start of the following day, but now it was not going to happen. ALJ Allen-Brecher encouraged plaintiff's counsel to finish Lacayo's cross-examination the next day.

*April 18, 2012—Day Seven*

On April 18, 2012, the hearing commenced at 9:12 a.m. As the parties' attorneys began criticizing each other, ALJ Allen-Brecher expressed frustration with their behavior. Lacayo's cross-examination continued.

Lacayo stated *Chanticleer* exhibits were still being gathered on December 1, 2009. ALJ Allen-Brecher noted there was confusion in the record as to when plaintiff was put on notice about the deficient binder supplies, namely, whether it was November 23 or December 23, 2009. Lacayo testified she sent medical records to Albee on November 12, 2009. Redirect commenced at 10:11 a.m. Lacayo said plaintiff knew there were not enough binders at least by December 23, 2009. Thereafter, plaintiff saw the exhibits were still in boxes and she did not tell Lacayo to do anything. Lacayo's testimony was completed at 10:27 a.m. After a break, plaintiff began testifying.

Plaintiff graduated from Yale Law School in 1973. She had not received a performance evaluation at the DSS since 2005. East became her de facto supervisor in 2006.[13] She received the *Chanticleer* file in the spring of 2009. The file contained a list of potential witnesses. Additional witnesses could be added depending on how the case progressed. She compiled a list of witnesses and other contacts very early in the case.

*Chanticleer* was originally set for hearing in October 2009. At that time it appeared the case was likely to settle. As a settlement was being negotiated, another major violation occurred. The accusation against the facility was amended in September. The facility's owners hired a new lawyer who was known for going to trial. The final prehearing conference was held on November 23, 2009. She had never been ordered to

---

[13] At this point she started discussing the details of how he came to become the official supervisor of her unit. ALJ Allen-Brecher advised her to listen carefully to questions so that her testimony could be completed by the following day.

14

prepare trial binders with as much detail as ALJ Benjamin ordered on that date. The hearing stopped for lunch and resumed at 1:08 p.m. with plaintiff's witness Colleen O'Neal.

O'Neal is a private attorney who represented the subject in *Carpenter*. Her client had agreed to take classes and the matter was settled. She contacted plaintiff to try to amend the settlement agreement. O'Neal did not see anything inappropriate in plaintiff's conduct. She did not believe plaintiff was advocating for her client. After cross-examination and redirect, O'Neal's testimony concluded at 2:13 p.m. and plaintiff resumed her testimony.

Plaintiff stated there were three settlement/prehearing conferences in the *Chanticleer* case. When plaintiff's attorney asked open-ended questions about what happened after each settlement conference, the DSS attorney objected. ALJ Allen-Brecher pleaded with the attorneys to "try to get through this," and urged plaintiff's counsel to be more precise.

Plaintiff sent Lacayo an e-mail on November 23, 2009, telling her the case had not settled. She told her the exhibits had to be placed in binders, paginated, and marked with numbers. She did not think there would be a problem at the time because she saw plenty of binders in the supply room. Lacayo's response was, "[T]hat's fine." Sometime around the beginning of December 2009, Lacayo brought her a box of exhibits. She verbally instructed Lacayo to prepare the exhibits in conformance with the conference statement. Over the next two weeks, plaintiff spent time in Lacayo's cubicle working on the exhibits. Lacayo was often out of the office due to vacation, training, working for other attorneys, and family illnesses. The office eventually ran out of supplies like dividers and tabs. Lacayo assured her the binders would get done.

On December 23, 2009, plaintiff was still photocopying exhibits. Lacayo approached her and said she was not going to be able to complete the exhibits in time for the hearing. She was leaving the office that afternoon and the following day she would be assisting another attorney. After Christmas, she would be on vacation. She also said the office did not have enough binders. Other attorneys had used binders for their cases

15

and very few were left. Each set of exhibits would have required four large binders, which would mean a total of 20 were needed. They had two or three. This was the first time plaintiff was told there were not enough binders.

Many people in the office were on vacation, including East and the office manager, and plaintiff was "totally bewildered" as to what to do. David helped her with photocopying and pagination. It did occur to plaintiff that she could have bought the binders herself. The problem was she did not know how to complete this "enormous task." She had never been trained on creating that type of binder and she would not have known what type of binders to buy. Also, there were other things she needed to get done by the January 4, 2010 hearing date, such as sending records to the expert witness. She came to the office for a few hours on Christmas day. She also came in on weekends and furlough days, as well as on her normal tele-work day. She was in the office Monday through Friday the week after Christmas and continued working on the exhibits. They had to be finished by Thursday, December 30, to be picked up by the courier. The exhibits were ready in time for the courier, but they were in boxes, not binders.

After a break, the hearing resumed at 3:24 p.m. ALJ Allen-Brecher stated she had been thinking about how to deal with the case, which she said had to be completed by the following afternoon. She noted the hearing had already taken three days more than the original estimate: "So what we are doing is this: I am going to give [plaintiff's counsel] up until tomorrow morning at 10:00 a.m. to finish the direct examination of [plaintiff]. You're going to have [to] be efficient. And part of the problem is there's been a lack of efficiency in the way the questions have been asked in this case. And there's also been a lack of civility which has caused a lot of unnecessary objections and unnecessary use of time." She then stated she would give plaintiff until 11:00 a.m. The DSS attorney would have from 11:00 a.m. until 2:00 p.m. to cross-examine and would have until 5:00 p.m. for rebuttal.

ALJ Allen-Brecher explained: "And you know, folks, this is eight days on an adverse action that isn't that long. It's unprecedented for me to be doing this as we've done it. I have so many cases, and I have not had this struggle or problems for years.

16

But you folks are making this one of the most difficult cases that I have experienced in the way it's being presented. And I'm not going to point my fingers at any one person. But I can tell you that it has been extraordinary and unnecessarily problematic. So I've got to set limits. I can't let this be out of control, and that's what I've got to do. I don't have any choice. So I don't think any judge in a writ is going to overturn it based upon the time limitations I'm setting forth, but you certainly can deal with that, if you want to, on a writ." The parties agreed to start the next day at 8:30 a.m.

At this point, the DSS attorney complained there would be an "extreme imbalance" as to the length of time plaintiff would testify on direct compared to what he was allowed for cross-examination. The ALJ noted he had been given much more time than plaintiff to present his case-in-chief. She added: "And I feel like if I give you an extra half hour, I'm going to have an extra three hours taken from me. There's no reason this case should have taken as long as it's taken. I should have laid out stricter guidelines earlier. But at this point, I have no choice. I told you we were going to be done by Thursday afternoon, and we are going to be done by Thursday afternoon."

Plaintiff's testimony continued. The first day of the *Chanticleer* hearing was held in San Jose. Plaintiff arrived at 9:30 a.m., which was the start time. However, she had to arrange the exhibits, which delayed the start of the hearing. Opposing counsel noted the lack of binders, but ALJ Benjamin elected to proceed. The following day, opposing counsel pressed harder on the fact that the exhibits were not in binders. The ALJ ordered her to have the exhibits ready by Monday, January 11, 2010. Plaintiff relayed the order to Lacayo. Lacayo laughed. That Friday was a furlough day, so the work would have to be completed that Thursday. Lacayo said she would be out of the office, so plaintiff called DeBaun. She also spoke with East, who told her to tell the judge to give them more time. The judge was not happy with this answer. On Thursday January 7, staff at the DSS Oakland office finished one set of binders. The task took four people the better part of a day. Of the five sets of exhibits, this was the only set the DSS office put in binders. ALJ Benjamin and opposing counsel arranged to put their own binders together. Plaintiff kept her own set in the boxes.

Regarding the subpoenas, plaintiff had contacted witnesses as early as September 28, 2009. She asked Lacayo to make travel arrangements, but there were complications. In one case, a payment authorization did not go through. Lacayo said she had done everything she could. Plaintiff resolved the matter by going to the hotel on a Sunday and using her personal credit card to guarantee the rooms. Plaintiff asked David to subpoena some witnesses while Lacayo was on vacation. Plaintiff had been told by a former supervisor that as the attorney she could not serve subpoenas herself.

As to the sending of evidence to the expert witness, Lacayo had sent medical records on November 30, 2009. Lacayo did not send client files because she believed it was not proper to send anything other than medical records. The expert later said she needed the client records. Plaintiff waited until December 28, when Lacayo was out of the office, to send them. She believed it would have been futile to ask East for assistance because "he would always come in on the side of [Lacayo]." Plaintiff said she has no control over getting her cases done because East does not support her. At the end of the day, ALJ Allen-Brecher reiterated that direct examination of plaintiff would end at 11:00 a.m. the following day, "regardless of where we are."

### April 19, 2012—Day Eight

The hearing started at 8:40 a.m. Plaintiff's counsel began questioning plaintiff for the sole purpose of moving exhibits into evidence. Later, plaintiff clarified she asked David to call some witnesses to get their contact information. None of these witnesses were represented by counsel. Plaintiff asked David to call an employee at the Chanticleer facility because the owner, who was represented by counsel, often answered the phone. It was awkward for plaintiff to call the facility. She wanted to get an alternate contact number so she would not have to speak with that witness in the owner's proximity. At one point a binder went missing and David found it in East's office underneath his desk.

At 11:00 a.m., ALJ Allen-Brecher cut off plaintiff's testimony. Plaintiff's counsel objected, complaining the DSS had taken five days for its case while she had had less than a quarter of that time to respond. She also noted that time had been spent in settlement talks even after plaintiff said she did not want to settle. ALJ Allen-Brecher

18

opined that a lot of time had been wasted in plaintiff's direct examination because counsel was not organized. The judge gave her until 11:30 a.m.

Neither East nor Wallace ever asked her to explain her side of the story on the binders. She acknowledged ALJ Benjamin deemed her to have arrived late on at least two hearing days. As to the *Vinarao* case, she asserted she was prepared. At that point, ALJ Allen-Brecher halted direct examination. After a break, they resumed on the record at 11:37 a.m.

On cross-examination, plaintiff did not recall the explanation she gave to ALJ Benjamin for her lateness. She conceded she implied she was late due to having to care for a family member. In one exchange, ALJ Allen-Brecher said she would give opposing counsel more time because plaintiff was causing unnecessary delay by objecting to questions. DSS's counsel also complained plaintiff was obfuscating to cause delay. As cross-examination continued, ALJ Allen-Brecher noted plaintiff's testimony appeared to be evasive. For example, she was asked: "[D]o you recall testifying—I've asked you this numerous times now—about you saying words to the effect that Mr. East did not give me a chance to explain my side of the story?" Plaintiff answered: "I did not say that."

Plaintiff was assigned to do CBCB hearings in 2010. CBCB cases appear on open case status reports for the attorney to whom the cases are assigned, which in the Oakland office is Evans. Plaintiff was authorized to look at the CBCB calendar, which could have listed at least some of the CBCB hearings she worked on. She did not know if she looked at the calendar when she was asked about her peremptory challenges. She never asked Evans to help her create a list of those cases.

Plaintiff did not handle the *Chanticleer* matter as well as she would have liked. When she learned on December 23, 2009, that there were not enough binders, she did not inform her superiors. She did not seek binders from other DSS offices. Nor did she ask for help. She was not confused about what ALJ Benjamin wanted. But she would have needed training on how to prepare the binders herself, the kind of training legal analysts get. She would not have been able to do it on her own without a large amount of time.

19

On redirect, plaintiff said East was very condescending and sarcastic when she asked him for help. He appeared to have already concluded she was an incompetent employee. He never helped her resolve problems in the past and she did not believe it would have made a difference if she had gone to him for assistance in the *Chanticleer* matter. The late subpoenas did not cause any witness to fail to testify. ALJ Benjamin did not sanction her or the DSS in the binder matter, and the outcome was not affected because the DSS prevailed. She did not believe the outcome was influenced by the addition of Gilmore-Benner because by the time she arrived plaintiff had already completed the direct case. ALJ Allen-Brecher cut off plaintiff's testimony shortly thereafter, at 4:30 p.m. The DSS was given one hour for its rebuttal case.

At 5:30 p.m., plaintiff's counsel sought to have evidence marked to show that ALJ Allen-Brecher's time limitation had deprived her of the opportunity to introduce evidence. The judge indicated she was going to be off work for a month, and nothing was going to get done until she came back. She ordered the parties to submit written closing arguments by May 21, 2012.

### ALJ Allen-Brecher's Decision

In her written decision dated August 1, 2012, ALJ Allen-Brecher concluded plaintiff's testimony was not credible. To the extent there were inconsistencies, she credited the testimony of the DSS's witnesses. As to *Chanticleer,* she concluded plaintiff had committed inexcusable neglect of duty by failing to comply with the prehearing order regarding exhibit preparation, delaying service of subpoenas, arriving late to the hearing, and being unnecessarily argumentative. Some of her statements to ALJ Benjamin also constituted discourteous treatment. Additionally, her misconduct resulted in inefficiency and brought discredit to the DSS. However, the charge pertaining to the alleged misuse of secretarial staff was not proved.[14]

---

[14] The decision does not contain explicit findings as to plaintiff's alleged failure to competently examine witnesses.

20

ALJ Allen-Brecher also found plaintiff had committed inexcusable neglect of duty in the *Vinarao* and *Butler* cases.[15] In the *Rosa* and *Cuenca* cases, plaintiff committed insubordination and willful disobedience when she failed to respond to the requests from her superiors. However, the charge that she violated the policy to seek authorization for peremptory challenges was dismissed because the DSS failed to show she was on notice of this policy. Allen-Brecher also dismissed the charge as to the *Carpenter* case. She concluded there was proof of plaintiff's incompetency, especially in the *Chanticleer* matter. She found the 60-day suspension was warranted.

On September 21, 2012, plaintiff filed a petition for rehearing, claiming she was denied due process because she was not allowed to finish her testimony and was unable to tailor her defense due to the last-minute cutoff. Specifically, she was prevented from introducing exhibits or testifying on the *Butler* and *Rosa* charges, and was given insufficient time to prove up a motion to dismiss. She further asserted she was not solely responsible for the hearing delays She also argued ALJ Allen-Brecher had made erroneous evidentiary rulings and unsupportable factual findings, and had shown bias against her during the proceeding. The petition was deemed denied because the next scheduled SPB meeting was slated to occur after the expiration of the statutory 60-day rehearing period.

On December 19, 2012, plaintiff filed a petition for writ of mandate in the trial court, again raising her due process concerns. She filed an amended petition on April 12, 2013.

***The Trial Court's Ruling***

On November 27, 2013, the trial court issued its 36-page decision granting the petition for writ of mandate. The court concluded ALJ Allen-Brecher had abused her discretion and had denied plaintiff due process based primarily on two incidents: (1) the judge's abrupt announcement of a firm time limit for the plaintiff's case-in-chief on the

---

[15] ALJ Allen-Brecher dismissed a charge that plaintiff had committed an act of dishonesty in *Butler*.

21

afternoon of the penultimate day of the hearing; and (2) her decision to grant the motion to quash petitioner's subpoenas for ALJs Benjamin and Schneider, while at the same time allowing DSS witnesses to testify as to statements allegedly made by Benjamin. The court concluded the time limitation in conjunction with the hearsay rulings also created an appearance of bias. The court further found the factual findings made in connection with the *Vinarao* case were not supported by substantial evidence. As to the *Chanticleer* matter, the SPB's ruling could not be properly evaluated due to the missing transcript of Lacayo's testimony. The court also concluded the findings and legal conclusions with respect to the *Butler* and *Rosa* cases could not be upheld because plaintiff was not given the opportunity to present her side of the story. This appeal followed.

## DISCUSSION

### I.      *State Personnel Board Proceedings*

The procedures for imposing discipline upon a state employee are well established. In the first instance, it is the responsibility of the employing department to determine whether cause for adverse action exists and, if so, the discipline that should be imposed. (Gov. Code, § 19574.) In reaching such a decision, the employer must give the employee notice of the proposed action and the reasons therefor, and must accord the employee an opportunity to respond. (*Ibid.*; *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 215 (*Skelly*); *Department of Parks & Recreation v. State Personnel Bd.* (1991) 233 Cal.App.3d 813, 827 (*Department of Parks & Recreation*).) After complying with these due process requirements, the employer may then impose the discipline it believes is warranted by the circumstances. (*Skelly, supra,* at p. 215.)

Once the employer serves the requisite written notice of adverse action, the employee may file a written answer with the SPB, which triggers the SPB's review of the adverse action. Such a review consists of a hearing and a decision in writing. (Gov. Code, §§ 19575, 19578, 19582; *Department of Parks & Recreation, supra,* 233 Cal.App.3d at pp. 823, 827.)

In most instances, the SPB assigns an ALJ to conduct the hearing but the responsibility for the decision remains the ultimate responsibility of the SPB. The ALJ

22

prepares a proposed decision which the Board may adopt or reject in whole or in part. (Gov. Code, § 19582, subd. (b); *California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 583 (*State Personnel Bd.*)) Since the SPB derives its adjudicatory power from our state Constitution, its decisions are entitled to judicial deference. (*Department of Parks & Recreation, supra,* 233 Cal.App.3d at p. 823; see also *State Personnel Bd., supra,* at p. 584.)

## II. Standards of Review

"Code of Civil Procedure section 1094.5 governs judicial review of a final decision by an administrative agency if the law required a hearing, the taking of evidence, and the discretionary determination of facts by the agency. [Citation.] The petitioner must show that the agency acted without or in excess of jurisdiction, did not afford a fair trial, or prejudicially abused its discretion. [Citation.] An abuse of discretion is shown if the agency did not proceed in the manner required by law, the decision is not supported by the findings, or the findings are not supported by the evidence. [Citation.]" (*Pedro v. City of Los Angeles* (2014) 229 Cal.App.4th 87, 98–99 (*Pedro*).)

" '[I]n cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record.' [Citation.] A trial court exercising its independent judgment must afford a strong presumption of correctness to the administrative findings. [Citation.] On appeal, we review the trial court's factual findings under the substantial evidence test if the trial court exercised its independent judgment. [Citation.]" (*Pedro, supra,* 229 Cal.App.4th 87 at p. 99.)

"Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible, and of solid value. We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence. The evidence is sufficient to support a factual finding only if an examination of the entire

record viewed in this light discloses substantial evidence to support the finding. [Citations.]" (*Pedro, supra,* 229 Cal.App.4th 87 at p. 99.)

"An appellate court independently determines whether the agency prejudicially abused its discretion by failing to proceed in the manner required by law, such as by failing to comply with required procedures, applying an incorrect legal standard, or committing some other error of law. [Citations.]" (*Pedro, supra,* 229 Cal.App.4th 87 at p. 99.)

### III.    *Due Process*

The DSS claims ALJ Allen-Brecher's decision to cut off plaintiff's testimony did not violate her right to due process. "The protections of procedural due process apply to administrative proceedings [citation]; the question is simply what process is due in a given circumstance. [Citations.] Due process, however, *always* requires a relatively level playing field, the 'constitutional floor' of a 'fair trial in a fair tribunal,' in other words, a fair hearing before a neutral or unbiased decision-maker. [Citations.]" (*Nightlife Partners, Ltd. v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 90.)

The DSS claims the record demonstrates plaintiff was allowed sufficient time to complete her case-in-chief. However, the trial court estimated DSS witnesses were on the stand for 20 and one-half to 21and one-half hours, while plaintiff and her witnesses testified for about 14 and one-half hours. This is a fairly substantial difference. Our review of the record confirms this disparity, and the DSS does not contest the court's calculations. Significantly, the DSS was not subject to the same time restrictions as plaintiff, and thus was able to proceed in accordance with its pretrial planning. While the DSS claims due process was satisfied because plaintiff was allowed five hours from the time of the imposition of the time limitation to the end of her testimony, it does not contend that she was able to present a complete defense to all of the charges in the NOAA.

The DSS also claims plaintiff was not blindsided because ALJ Allen-Brecher had issued warnings about time limitations. We observe those warnings were not all addressed solely to plaintiff. For example, on March 13, 2012, the judge said that she

24

was putting *both* parties on notice that because she was concerned about being able to finish the case by that Friday, examination for both sides was going to be limited to direct, cross and redirect. Later, when the case stretched into its second week, she noted she had added extra days based on both parties' time estimates. Even when warnings were directed at plaintiff's counsel, the judge did not threaten an absolute cutoff: "And I don't want to have to restrict time, but I will if I feel that we're really going into the weeds in getting this information that isn't probative to the case on a regular basis, which is what I'm getting concerned about, honestly. So just an admonition now, I'm not doing anything yet, but I'm concerned about the amount of time that we're taking for things that are not probative."

Similarly, while we do not disagree that plaintiff's testimony included some narrative, nonresponsive answers and that her whispering was distracting, it is the judge's responsibility to maintain order in the hearing room, as she did at one point by ordering plaintiff to sit in the back of the room. Essentially, the DSS argues that plaintiff and her counsel are entirely responsible for the judge's decision to impose the last-minute cutoff. The facts are, however, that the DSS was afforded ample time to present its own case. The primary witnesses against plaintiff, Wallace, East, and Lacayo, testified over several days. Thus, unlike plaintiff, the DSS was allowed to fully present its case-in-chief.

The DSS also asserts petitioner's counsel is at fault because she chose to call defense witnesses prior to completing her own testimony on direct, notwithstanding her "recognition early on that she was well aware that her time was limited." It also faults her for failing to tie her questions to the charges as set forth in the NOAA. The short answer to this is that the time limitation was imposed by ALJ Allen Brecher on the second to last day of the hearing. Hence, plaintiff's counsel did not know at the outset that the time limit would be imposed and cannot be entirely faulted for having failed to organize her presentation to account for the deadline.

The DSS contends there is no due process requirement for a judge to set time limits before the proceedings begin and that it is permissible to impose time limits on testimony "at the moment it becomes apparent that testimony is running too long." In the

25

context of a civil trial, it is established that a court has the power to rule on the admissibility of evidence, to exclude proffered evidence that is deemed to be irrelevant, prejudicial or cumulative, and to expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact. (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 (*Carlsson*).) However, " '[d]enying a party the right to testify or to offer evidence is reversible per se.' [Citations.]" (*Id.* at p. 291.) Here, it is not a particular witness whose testimony was running too long; it was the entire proceeding.

" 'Ordinarily, parties have the right to testify in their own behalf [citation], and a party's opportunity to *call witnesses to testify and to proffer admissible evidence is central to having his or her day in court*.' [Citation.] . . . ' "One of the elements of a fair trial is the *right to offer relevant and competent evidence on a material issue*. Subject to such obvious qualifications as the court's power to restrict cumulative and rebuttal evidence . . ., and to exclude unduly prejudicial matter [citation], denial of this fundamental right is almost always considered reversible error" ' [Citations.]" (*Carlsson, supra,* 163 Cal.App.4th at p. 292.)

In *Carlsson,* the court hearing a family law case put arbitrary time limits on the presentation of evidence and deemed the husband's case-in-chief concluded before he finished presentation of the evidence. (*Carlsson*, *supra*, 163 Cal.App.4th at pp. 290–292.) In doing so, "[t]he trial court essentially ran the trial on a stopwatch, curtailing the parties' right to present evidence on all material disputed issues." Under the constant threat of a mistrial, the judge pressured counsel into rushing through her presentation and continuing without a break. The appellate court found reversible error most especially because the judge abruptly ended the trial in the middle of a witness's testimony, prior to the completion of one side's case and without giving the parties the opportunity to introduce or even propose additional evidence.

As the *Carlsson* court explained, " ' "The trial of a case should not only be fair in fact, but it should also appear to be fair." [Citations.] A prime corollary of the foregoing rule is that "[a] trial judge should not prejudge the issues but should keep an open mind

26

until all the evidence is presented to him." ' [Citation.]" (*Carlsson, supra,* 163 Cal.App.4th at pp. 290–291.) Having earlier heard the DSS witnesses' testimony in this proceeding certainly afforded ALJ Allen-Brecher with an informed perspective upon which to evaluate any new testimony plaintiff might have provided. But the judge could not weigh the credibility of testimony she did not hear.

The DSS is correct that imposing a time limit that precludes a plaintiff from completing her case-in-chief does not necessarily deprive the plaintiff of due process. However, the case it relies on, *California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, is distinguishable. In that case, the parties knew at the outset that the trial would be limited to 12 days. They also agreed the responding party would get the case at noon on the eighth day of trial. (*Id.* at pp. 17–18.) The appellate court observed specifying time limits in court hours and applying these limits to examination of a party's witnesses and cross-examination of the opposing party's witnesses can be permissible. In such cases, however, the parties are entitled to be kept advised on a regular basis and upon request of how much time each side has used and has remaining. (*Id.* at p. 22.) This suggests the parties need to know how much time they will have so they can strategically allot their presentation between cross-examination and direct testimony.[16] Again, "the court must permit a party to have his day in court. Denying a party the right to testify or offer evidence deprives him of a fair trial and constitutes reversible error. [Citation.]" (*Id.* at pp. 22–23.) To impose a stringent time limit at the end of a case is unfair, particularly when only one side is adversely affected.[17] Common sense holds it is unfair to change the rules in the middle of the game.

---

[16] We agree with the trial court that even if the parties did spend an equal time on combined examination and cross-examination, plaintiff's counsel had no idea as she cross-examined the DSS witnesses that the time she spent doing so would be deducted from the time she would be allowed to affirmatively present her client's defense.

[17] We also agree with the trial court's conclusion that ALJ Allen-Brecher did not identify any reason why the hearing had to end at that particular moment, other than a general sense that the proceeding had taken longer than it should have.

Because plaintiff was prevented from completing her presentation, we are unable to say how ALJ Allen-Brecher would have regarded the facts in evidence in light of further facts which might have been elicited. That evidence supports her findings does not cure the constitutional defect. (See *Powhatan Mining Co. v. Ickes* (6th Cir. 1941) 118 F.2d 105, 109 [denial of cross-examination].) The error is inherently prejudicial. (See *Fremont Indemnity Co. v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 965, 971.) A new hearing is thus required. (*Sinaiko v. Superior Court* (2004) 122 Cal.App.4th 1133, 1142, 1146.)

## IV.    *Admission of Hearsay*

The trial court faulted ALJ Allen-Brecher for allowing Wallace to testify about the conversation she had with ALJ Tompkins in which the Presiding ALJ relayed comments made to her by ALJ Benjamin concerning plaintiff's performance in *Chanticleer*. The DSS contends the trial court erroneously substituted its judgment for that of the SPB judge in faulting this testimony. It asserts the administrative ruling did not contribute to a denial of due process.

Government Code section 11513 governs the introduction of evidence at a formal administrative adjudication. Subdivision (c) of that statute provides the hearing "need not be conducted according to technical rules relating to evidence and witnesses, except as hereinafter provided. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of the evidence over objection in civil actions." Subdivision (d) of that statute provides, in pertinent part: "Hearsay evidence may be used for the purpose of supplementing or explaining other evidence but over timely objection shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions."

The DSS first claims the statements were not hearsay because they were not offered as proof of plaintiff's misconduct at the *Chanticleer* hearing. Rather, they were offered to explain Wallace's state of mind and the reasons why she chose " 'to sign off on

28

an adverse action.' " The statements also established the harm caused to the DSS's reputation. This argument is disingenuous. As the trial court noted, Wallace's testimony depended on the truth of matters ALJ Tompkins asserted out of court—namely, that ALJ Benjamin had spoken to Tompkins about plaintiff and that he had made critical comments.

The DSS notes that if considered for the truth, hearsay evidence of misconduct is permissible to supplement or explain other evidence in the context of the administrative hearing. It also asserts there is no indication that ALJ Allen-Brecher relied on Wallace's testimony in rendering her decision. Thus it claims plaintiff was not prejudiced and the trial court's finding is erroneous. We disagree. The transcripts of the *Chanticleer* hearing reveal what ALJ Benjamin said during the hearing, but are not evidence of his subjective state of mind. The only evidence of his perceptions of plaintiff's performance was provided by Wallace's hearsay testimony. Even if the SPB's written findings do not specifically mention it, we cannot presume this evidence had no influence on the decision. In any event, due to the missing transcript of Lacayo's testimony (discussed below), we concur with the trial court's view that the *Chanticleer* charges cannot properly be evaluated.

## V.   *Appearance of Bias*

The DSS claims the record fails to demonstrate either the appearance of bias or any actual bias. The trial court concluded ALJ Allen-Brecher's imposition of a firm time limit on the case, in conjunction with her rulings on the motion to quash while allowing Wallace to testify as she did were "so palpably unfair as to create an appearance of bias." The DSS renews its arguments that these rulings were not unfair and did not result in the deprivation of due process. Further, the agency stresses that even the court below noted the ALJ made rulings favorable to plaintiff and appeared to be generally evenhanded in dealing with episodes of argumentativeness.

We have read the transcript of the hearing. We agree the record does not contain any flagrant examples of overt actual bias. However, we also agree with the trial court's view that the rulings in question reflect an *appearance* of bias. The admission of triple

29

hearsay, combined with the cutting off of plaintiff's presentation of evidence without informed advance notice, can reasonably be viewed as being so unfair so as to create an appearance of bias against plaintiff.

## IV. The Vinarao Charges

The trial court additionally ruled that ALJ Allen-Brecher abused her discretion by making a factual finding unsupported by substantial evidence as to the *Vinarao* case, the case involving plaintiff's attempts to move the criminal conviction records into evidence. The DSS claims that in so doing, the court improperly reweighed the evidence by crediting ALJ Johnson's testimony over East's. We disagree.

Both East and Johnson were present at the *Vinarao* hearing and described plaintiff's presentation of the exhibits during the hearing below. The factual veracity of East's observations is not the issue. Instead, the trial court focused on the evidentiary value of East's subjective view of her performance. Along those lines, ALJ Johnson was in the best position to offer an opinion as to whether plaintiff's actions fell below the standard of care. Since he testified he had no concerns about her conduct, the court below was reasonable in concluding substantial evidence did not support ALJ Allen-Brecher's contrary ruling on the *Vinarao* charges.

## VI. The Missing Transcript of Lacayo's Testimony

The DSS claims substantial evidence supports the *Chanticleer* ruling notwithstanding the missing portion of Lacayo's testimony. We disagree. Lacayo's testimony was relevant as to the finding that plaintiff failed to ensure the required exhibit binders were ready by the start of the hearing, and that she failed to issue witness subpoenas in a timely fashion.

In *Chavez v. Civil Service Com.* (1978) 86 Cal.App.3d 324 (*Chavez*), an entire day of the administrative hearing could not be transcribed because of a defective tape. (*Chavez,* at p. 326.) The appellate court in *Chavez* stated that a petitioner is entitled to have the entire administrative record reviewed. It also indicated that if a portion of the record is missing, a rehearing is necessary only when the missing portion cannot be

30

reconstructed and the partial record is not adequate for review.[18] (*Id.* at p. 332.)  This occurs if the missing testimony is necessary and material for the court to determine whether the administrative decision is supported by substantial evidence.  (See *Aluisi v. County of Fresno* (1958) 159 Cal.App.2d 823, 825–828.)

While there is evidence of the dates subpoenas were issued in *Chanticleer,* the DSS concedes it is unknown, in light of the missing portion of the record, whether a hearsay exception applies to the document containing that evidence.  And while there may be substantial evidence supporting ALJ Allen-Brecher's conclusion that the subpoenas were not served in timely fashion, there is no way to confirm this finding without all the evidence that was presented at the hearing.

As the DSS acknowledges, the NOAA was based in significant part on the *Chanticleer* enforcement action.  Lacayo's testimony is critical to determining what occurred during what the trial court deemed the "initial phase of the binder fiasco," namely, whether plaintiff failed to ensure the binders were ready, or that a plan was in place to get them ready, by December 23, 2009, which was Lacayo's last day of significant work on the *Chanticleer* case.[19]  While it is undisputed the binders were not prepared in accordance with ALJ Benjamin's expectations, without a complete record it is not possible to fairly assess plaintiff's culpability.  Accordingly, we concur with the trial court that the missing testimony is necessary and material for the court to determine whether the administrative decision is supported by substantial evidence.

## VII.    *The Remedy*

In general, if a party has not received a proper administrative hearing, the matter is remanded back to the agency to provide "a full and fair hearing."  (*English v. City of Long Beach* (1950) 35 Cal.2d 155, 160; see *National Auto. & Cas. Ins. Co. v. Downey* (1950) 98 Cal.App.2d 586, 594 ["Where an administrative agency has not conducted a

---

[18] On appeal, the DSS does not contend that the missing testimony can be reconstructed from ALJ Allen-Brecher's notes or other available resources.

[19] Below, the DSS implicitly conceded that Lacayo did not warn plaintiff that the office lacked supplies needed to create the binders until December 23, 2009.

hearing properly, or has committed error of law, or if the evidence is insufficient to support the findings, and it is still possible under the circumstances for the agency to exercise its discretion, the court should remand the matter to the agency for further consideration."].) The DSS requests that any remand be limited to reevaluating or retrying the "limited factual issues that were in part addressed in the missing testimony." Significantly, the DSS does not dispute that plaintiff was unable to testify about several of the charges against her, primarily those involving the *Butler* and *Rosa* cases. While we are sympathetic to the DSS's position that judicial economy would be served by avoiding a retrial of the entire matter, the premature termination of plaintiff's case-in-chief and the resulting due process violation does not allow for a limited remand.[20]

## VIII. *Attorney Fees*

Finally, plaintiff cross-appeals, contending she is entitled to attorney fees to cover the cost of a new hearing because the conduct of the SPB was arbitrary and capricious. (See Gov. Code, § 800.) The trial court concluded the SPB's conduct did not "sink to the 'arbitrary and capricious' level required for a fee award in an administrative mandamus proceeding." It also distinguished the instant case from *Frase v. Gourley* (2000) 85 Cal.App.4th 762, a case on which plaintiff relied below and in this appeal. In *Frase,* the appellate court affirmed a grant of a writ of mandate in a case in which the Department of Motor Vehicles had lost a portion of the administrative record and then declined to pay for reconstructing it for use in the trial court's hearing on the mandate petition. (85 Cal.App.4th at pp. 765–767.) We agree with the trial court that a prospective ruling on the point is speculative and unripe.

**DISPOSITION**

The judgment is affirmed.

---

[20] In light of our conclusion, we need not consider the parties' remaining arguments.

32

_____
DONDERO, J.

We concur:


_____
MARGULIES, Acting P.J.


_____
BANKE, J.

33